67 F.3d 750
 95 Cal. Daily Op. Serv. 6988, 95 Daily Journal
D.A.R. 11,981
Alfredo Cesar UBAU-MARENCO; Sandra De Ubau-Zuniga; Gerardo
Bautista Ubau-Zuniga; Alfredo Cesar Ubau-Zuniga,
Petitioners,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 93-70777.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 10, 1995.
Decided Sept. 5, 1995.
 
 Milton Dan Kramer, Kramer & Miyashita, San Francisco, California, for petitioners.
 Jane Gomez & Edward J. Duffy, United States Department of Justice, Office of Immigration Litigation, Washington DC, for respondent.
 Petition for Review of a Decision of the Board of Immigration Appeals.
 Before: CHOY, POOLE and KLEINFELD, Circuit Judges.
 CHOY, Circuit Judge:
 
 I.
 
 1
 Dr. Alfredo Cesar Ubau-Marenco, his wife Sandra Zuniga de Ubau-Zuniga, and two of their children (collectively "petitioners") appeal a final order of the Board of Immigration Appeals ("BIA"). The BIA dismissed their appeal from the Immigration Judge's order denying their applications for asylum and withholding of deportation. 8 U.S.C. Secs. 1158(a) & 1253(h). Petitioners appeal only the denial of their asylum claims.
 
 
 2
 Petitioners are natives and citizens of Nicaragua. Petitioners claim that they left Nicaragua in February of 1988 because they were being persecuted by the Sandinista authorities on account of their anti-Communist views. Petitioners assert that because of their political views, they would be subject to persecution should they be forced to return to Nicaragua.
 
 
 3
 At the deportation hearing, Dr. Ubau-Marenco testified on behalf of the petitioners. In Nicaragua, Dr. Ubau-Marenco's parents owned a transportation business. But, in 1979, the Sandinista authorities seized the business' vehicles without compensation. After the seizure, his family continued to own a farm from which it sold rice to the Nicaraguan government. Then, in 1982, Dr. Ubau-Marenco purchased a pharmacy which he profitably operated with licenses from the government. At the time of the deportation hearing, his sister was still operating the pharmacy with the requisite licenses.
 
 
 4
 Dr. Ubau-Marenco attended medical school in Mexico from 1974 to 1978 and completed his studies in Nicaragua in 1986. He then successfully completed an internship under Cuban supervisors at the government-run General Hospital in Granada, Nicaragua from February 1987 to December 1987. At the deportation hearing, Dr. Ubau-Marenco testified that throughout his internship his Cuban supervisors mistreated him because he openly disapproved of the Communist system. In particular, he was required to embalm the cadavers of slain soldiers. Like several other doctors, he was required to examine young military recruits to determine their fitness to serve in the Sandinista Army.
 
 
 5
 Dr. Ubau-Marenco claimed that his outspokenness against the Communist system led to a poor recommendation from his supervisors, and he speculated that this resulted in his being sent to fight in the northern region of the country in January of 1988. Although he was required to fulfill his compulsory military service when his internship ended, Dr. Ubau-Marenco believed that this assignment was a form of punishment for his political views. After one week at the front, Mrs. Ubau-Marenco notified him that one of their sons was ill. The army gave Dr. Ubau-Marenco a one-week pass to return home.
 
 
 6
 Dr. Ubau-Marenco did not return to his post. On February 4, 1988, he left the country with his wife and two sons, leaving behind two daughters and numerous other family members. Dr. Ubau-Marenco was able to obtain passports and travel permission from a former patient who worked at the Immigration Office. Petitioners experienced no problems leaving the country. Dr. Ubau-Marenco testified that after his departure, Sandinistas came to his father's house looking for him, and his father told them that he had left the country. Dr. Ubau-Marenco's parents, two daughters and several siblings still remain in Nicaragua, apparently without incident.
 
 
 7
 From 1985 until his departure in 1988, Dr. Ubau-Marenco was a spokesperson for an organization that promoted private enterprise and industry, known as the Higher Council of Private Enterprise, or COSEP.[1] He contends that the Sandinistas were hostile toward COSEP. On one occasion, members of the Sandinistas Defense Committee hurled sticks and rocks at the building in which he was attending a COSEP meeting.
 
 
 8
 Mrs. Ubau-Marenco owned a small clothing manufacturing factory. Like the pharmacy, this business was operated with a license from the government. Petitioners claim that because of Mrs. Ubau-Marenco's membership in COSEP, the government cut off her fabric supply. However, Dr. Ubau-Marenco also testified that material shortages existed in all parts of the country.
 
 
 9
 Petitioners claim that several members of their family have been harassed by the Sandinistas. Dr. Ubau-Marenco testified that the school attended by the Ubau-Marencos' children was attacked twice by members of the Sandinista Youth movement because the school was private and reputed to be "bourgeois." Dr. Ubau-Marenco also reported that one of his sons was followed home by Sandinista Youth members. Two of Dr. Ubau-Marenco's brothers have been arrested, one for black market trafficking and the other for being a "counterrevolutionary."
 
 
 10
 In an opinion dated May 4, 1989, the Immigration Judge found that petitioners had failed to establish eligibility for asylum or withholding of deportation and granted them thirty days' voluntary departure under section 244(e) of the Immigration and Nationality Act. 8 U.S.C. Sec. 1254(e).
 
 
 11
 Petitioners appealed to the BIA. With their appeal, petitioners submitted new, previously unavailable, evidence. In an Order dated August 30, 1993, the BIA dismissed the appeal after independently reviewing the record. The BIA found that petitioners failed to establish that they were either persecuted in Nicaragua or that they had a well-founded fear of persecution on account of political opinion should they return. The BIA rejected the additional evidence petitioners submitted with their appeal.
 
 
 12
 Petitioners timely appealed the BIA's decision, arguing that the BIA erred in finding that they were not eligible for a grant of asylum. Among other things, they maintain that the BIA failed to consider adequately the new evidence that they submitted with their appeal. Petitioners ask us to reverse and remand the BIA's Order, instructing it to grant their asylum applications.
 
 II.
 
 13
 Refugee status is extended to aliens who are unable or unwilling to return to their country of origin "because of persecution or a well-founded fear of persecution on account of ... political opinion." 8 U.S.C. Sec. 1101(a)(42)(A). As this court has recently reiterated, there are two steps in determining whether asylum applicants merit favorable relief. Kazlauskas v. INS, 46 F.3d 902, 905 (9th Cir.1995). Applicants for asylum must establish both that they are eligible for asylum because they are "refugees" within the meaning of the statute and because they are entitled to asylum as a matter of discretion. Id.; see 8 U.S.C. Sec. 1158(a).
 
 
 14
 This court thus reviews BIA decisions denying asylum under a two-tiered standard. First, the BIA's determination regarding refugee status must be upheld if it is " 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.' " INS v. Elias-Zacarias, 502 U.S. 478, 481, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992) (quoting 8 U.S.C. Sec. 1105a(a)(4)); Prasad v. INS, 47 F.3d 336, 338 (9th Cir.1995). Under the substantial evidence standard, this court defers to the BIA's factual findings unless the evidence applicants present is "so compelling that no reasonable factfinder could fail to find" otherwise. Elias-Zacarias, 502 U.S. at 481, 112 S.Ct. at 815. Mere disagreement with the BIA's appraisal of the facts is not a sufficient ground for reversal. Shirazi-Parsa v. INS, 14 F.3d 1424, 1427 (9th Cir.1994). Second, if refugee status has been established, this court reviews the BIA's ultimate denial of asylum for an abuse of discretion. Kazlauskas, 46 F.3d at 905. Here, the BIA held refugee status was not established in the first instance and only reached the question of whether petitioners would be entitled to favorable discretionary relief solely on the basis of past persecution. The BIA did not address the issue of whether it would favorably exercise its discretion if petitioners had established a well-founded fear of persecution.
 
 
 15
 A. Past Persecution.
 
 
 16
 Substantial evidence supports the BIA's finding that petitioners were not persecuted by the Sandinista authorities on the basis of their anti-Communist views. This court has defined persecution as " 'the infliction of suffering or harm upon those who differ (in race, religion or political opinion) in a way regarded as offensive.' " Desir v. Ilchert, 840 F.2d 723, 726-27 (9th Cir.1988) (quoting Kovac v. INS, 407 F.2d 102, 107 (9th Cir.1969)).
 
 
 17
 The claim that Dr. Ubau-Marenco was assigned to active military duty as a common soldier as punishment for his anti-Communist views and perhaps to ensure his death is unsubstantiated speculation. See Elias-Zacarias, 502 U.S. at 483-84, 112 S.Ct. at 816-17 (holding that alleged persecutor's acts must be motivated by desire to persecute on the basis of enumerated grounds). It is a "long-standing rule" that it is not persecution for a country to require that its citizens serve in the military. Abedini v. INS, 971 F.2d 188, 191 (9th Cir.1992).
 
 
 18
 Substantial evidence also supports the BIA's finding that the treatment Dr. Ubau-Marenco received from his Cuban supervisors did not rise to the level of persecution. Although he may have been given some undesirable assignments, Dr. Ubau-Marenco has failed to show that he was singled out for such duties or that these duties were punitive in nature or purpose. In fact, he testified that several other interns were required to give examinations to potential army recruits. Moreover, despite his claim that he was given undesirable and demeaning assignments as a form of punishment, Dr. Ubau-Marenco acknowledged that he received adequate training and experience during his internship; he admitted that his internship was successful from a "scientific point of view." Administrative Record ("AR") at 114.
 
 
 19
 Petitioners also claim that they are "economic" refugees. This court has found persecution where there is "a probability of deliberate imposition of substantial economic disadvantage upon an alien for reasons of race, religion, or political opinion...." Kovac, 407 F.2d at 107 (emphasis added); see also Desir, 840 F.2d at 727 (finding persecution where the applicant's ability to earn a livelihood had been "severely impaired" because threats on his life totally prevented him from working in his occupation). The evidence presented does not show that petitioners' ability to earn a livelihood in Nicaragua has been "severely impaired." Desir, 840 F.2d at 727. Dr. Ubau-Marenco was able to finish his studies in his chosen profession, is qualified to practice medicine in Nicaragua, and owns and operates a pharmacy there. Indeed, Dr. Ubau-Marenco's association with COSEP, for which he claims to have been persecuted, has provided him with financial benefits by enabling him to obtain the permits to operate his pharmacy.
 
 
 20
 Although it appears that the Sandinistas have taken steps which have economically harmed the petitioners, petitioners have failed to show that these actions rise to the level of economic persecution for political opinion. First, in 1979, the Sandinistas confiscated the family transportation business without compensation. This confiscation could contribute to a finding of persecution. See Samimi v. INS, 714 F.2d 992, 995 (9th Cir.1983) (holding the seizure of petitioner's father's land and livelihood because of his family's ties to the former Shah could contribute to a finding of persecution). Yet, the fact that after this seizure Dr. Ubau-Marenco's family continued to own and profitably operate a farm selling rice to the government militates against concluding that the seizure was persecutory. Secondly, the Sandinista regime refused to supply Mrs. Ubau-Marenco's factory with fabric. According to Dr. Ubau-Marenco, this refusal effectively shut down the business because it would be prohibitively expensive to import material from other countries. However, as the BIA found, there is no evidence that the denial of fabric was either targeted at petitioners or that it was tied to their political opinion. In fact, Dr. Ubau-Marenco testified that there is a fabric shortage in Nicaragua. This shortage, rather than an intent to persecute, may account for the government's refusal to supply the factory with fabric.[2]
 
 
 21
 On the basis of the above-discussed facts, we are not compelled to find that petitioners are refugees on the basis of past persecution alone and affirm the district court's holding on this issue.[3]
 
 
 22
 B. Well-Founded Fear of Persecution.
 
 
 23
 Even if they were not persecuted in the past, petitioners could still establish eligibility for asylum if they demonstrate that they possess a "well-founded fear of persecution" on account of their political opinion. 8 U.S.C. Sec. 1101(a)(42)(A). A well-founded fear requires that the petitioners' fear be both subjectively real and objectively reasonable. The subjective aspect, not in question here, is satisfied by credible testimony that the petitioners "genuinely fear[ ] persecution." Prasad, 47 F.3d at 338. To establish that a fear is objectively reasonable, the petitioners must come forward with evidence which is " 'credible, direct, and specific....' " Id. (quoting Shirazi-Parsa, 14 F.3d at 1427).
 
 
 24
 The BIA concluded that the petitioners' fears were not "objectively reasonable" because Dr. Ubau-Marenco was "able nevertheless to open and operate his own pharmacy, pursue a medical degree, participate in COCEP [sic], and complete his medical internship at a government-run hospital." BIA Opinion at 4.[4] In so concluding, the BIA declined to consider new evidence, relevant to whether petitioners have a well-founded fear of persecution, which petitioners attached to their appeal. We hold that the BIA erred in rejecting this new evidence and remand for it to reconsider its ruling.
 
 1.
 
 25
 The new evidence at issue consists of a summons and judicial decree[5] issued by the Criminal District Court of Granada on April 25, 1989 and May 6, 1989, respectively. The summons announces that Dr. Ubau-Marenco must appear before the Criminal District Court of Granada on April 26, 1989 to respond to the charge that he violated the "Law of order and public welfare, because of political view." AR at 46. The judicial decree proclaims that Dr. Ubau-Marenco has fifteen days in which to appear to answer to the charge of "Violation of public order, welfare and security, which brands him as a rebel" and proclaims that "[a]ll the authorities of the country are notified for his apprehension." AR at 48.[6] Neither document indicates the underlying action or actions which allegedly constituted violation of the law. The BIA briefly dismissed the summons and decree, stating: "Although respondents seek our consideration of this new evidence, they have failed to show that this new evidence would likely change the result in this case. See 8 C.F.R. Secs. 3.2, 3.8 (1992); Matter of Coelho, Interim Decision 3172 (BIA 1992)." BIA Opinion at 16.
 
 
 26
 On appeal, petitioners assert that the BIA failed to consider adequately the summons and decree in determining whether they qualify as refugees. They argue that had they remained in Nicaragua even two months longer, Dr. Ubau-Marenco would have been arrested and detained because of his political opinion. Moreover, petitioners argue that the documents on their face and the evidence in the record made manifest to the BIA the persecutory nature of the arrest summons and decree, as this evidence described the politically oppressive nature of the law which Dr. Ubau-Marenco had allegedly violated. The Respondent Immigration and Naturalization Service ("INS") counters that absent an abuse of discretion, the BIA's decision to reopen or remand a case for consideration of newly submitted evidence is squarely within the BIA's discretion. Without citing any authority, the INS maintains that the BIA reasonably explained its failure to remand the case to the Immigration Judge for consideration of the new evidence and asserts that, for this reason, we must uphold the BIA's decision.
 
 
 27
 In order to review the BIA's decision on this issue, we must first extrapolate from its terse statement the nature of its ruling. The authority cited by the BIA indicates that the BIA treated petitioners' attachment of the summons and decree to their appeal as a motion to reopen or to remand their case to the Immigration Judge for consideration of new evidence and denied the motion. In particular, the regulations cited by the BIA, 8 C.F.R. Secs. 3.2[7] and 3.8[8], govern motions to reopen or reconsider a BIA decision. These regulations are interpreted to apply also to motions to remand a case to the Immigration Judge for the consideration of new evidence not available at the time of the original hearing. Rodriguez v. INS, 841 F.2d 865, 867 (9th Cir.1987); see generally, Gittel Gordon & Charles Gordon, 6 Immigration Law and Procedure, Sec. 150.08[a], 150-44-46 (1995). The other authority cited by the BIA, Matter of Coelho, Interim Decision 3172 (BIA 1992), addresses a motion to remand. In light of these citations, and of the fact that motions to reopen are directed to the BIA after it has "rendered a decision," 8 C.F.R. Sec. 3.2, and here the evidence was submitted years before the appeal was decided, we review the BIA's decision on this issue as a denial of a motion to remand. See Rodriguez, 841 F.2d at 867 (observing that before the BIA renders a decision, motion is properly treated as a motion to remand rather than a motion to reopen).[9]2.
 
 
 28
 Although the BIA has discretion to determine when a proceeding should be remanded to the Immigration Judge, see INS v. Doherty, 502 U.S. 314, 323, 112 S.Ct. 719, 724-25, 116 L.Ed.2d 823 (1992), it may not exercise that discretion in a manner which is arbitrary, capricious, or contrary to law. See Aviles-Torres v. INS, 790 F.2d 1433, 1435, 1437 (9th Cir.1986) (reversing BIA's denial of request for reopening); Doherty, 502 U.S. at 330, 112 S.Ct. at 728 (noting "[e]ven discretion ... has its legal limits.") (Scalia, J., concurring and dissenting). We thus review the BIA's denial of a motion to remand for an abuse of discretion. See Doherty, 502 U.S. at 323, 112 S.Ct. at 724-25; Aviles-Torres, 790 F.2d at 1435.
 
 To merit a remand, a petitioner must:
 
 29
 make a prima facie showing that he is eligible for the relief sought, INS v. Jong Ha Wang, 450 U.S. 139, 143-44 n. 5, 101 S.Ct. 1027, 1030-31 n. 5, 67 L.Ed.2d 123 (1981) (per curiam), and explain his failure to present the evidence in the previous proceeding. 8 C.F.R. Secs. 3.2, 3.8. The evidence offered must be material and the petitioner must show that the evidence was not available or could not have been presented at the former hearing. 8 C.F.R. Sec. 3.8.
 
 
 30
 Aviles-Torres, 790 F.2d at 1436. In this case, petitioners would establish a prima facie case for refugee status if they present "affidavits or other evidentiary material," 8 C.F.R. Sec. 103.5, which demonstrate a well-founded fear of persecution on account of political opinion. See Sakhavat v. INS, 796 F.2d 1201, 1203 (9th Cir.1986). Evidence is material for the purpose of this analysis if it "tend[s] to strengthen the alien's claim for relief...." Elias-Zacarias v. INS, 921 F.2d 844, 854 n. 13 (9th Cir.1990), rev'd on other grounds by 502 U.S. 478, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). Even if petitioners make out a prima facie case that they are eligible for asylum, the BIA may deny their motion to remand in the exercise of its discretion if it provides "a reasoned explanation ... based upon 'legitimate concerns' " about the administration of the immigration laws. Mattis v. INS, 774 F.2d 965, 968 (9th Cir.1985) (quoting INS v. Rios-Pineda, 471 U.S. 444, 451-52, 105 S.Ct. 2098, 2103, 85 L.Ed.2d 452 (1985)).
 
 
 31
 We note that the INS conceded at oral argument that the summons and decree are material to petitioners' asylum claims. Indeed, the summons and decree appear to be highly relevant to determining whether petitioners possess a well-founded fear of persecution and thus whether they can establish a prima facie case for asylum eligibility. On their face, the summons and decree evince an intent on the part of the Sandinistas not only to arrest, but also to punish Dr. Ubau-Marenco for political reasons; the documents clearly state he is wanted for violating the law for political reasons and label him a "rebel." Moreover, the record reveals that the law under which Dr. Ubau-Marenco was charged was commonly used as a tool to quell political opposition. See Nicaragua, A Country Study (James R. Rudolph ed., American University 1981) ("Country Study" ); AR at 285. The Country Study reports that the Law of Public Order was designed and used to "punish[ ] those who would block the creation of a new society" and that it, among other repressive measures, was "perceived by outside observers as euphemisms for an increasingly repressive political-juridical system." Id. at 223; AR at 323.
 
 
 32
 With their appeal to this court, petitioners have submitted U.S. State Department Country Reports for the years 1988 and 1989. U.S. Department of State Country Reports on Human Rights Practices for 1988 (1989) ("1988 Country Report"); U.S. Department of State Country Reports on Human Rights Practices for 1989 (1990) ("1989 Country Report"). These reports reinforce the fact, revealed by the Country Study already in the record, that the law under which Dr. Ubau-Marenco was charged and was to be arrested was used by the Sandinistas to suppress political opposition. Petitioners request that we take judicial notice of these Country Reports, among other materials, in evaluating their appeal. The INS has not objected to this request. We exercise our discretion to take judicial notice of "appropriate materials that describe general country conditions when those sources bear on how an alien's particular experiences should be evaluated." Fisher v. INS, 37 F.3d 1371, 1379 n. 6 (9th Cir.1994); see also Shirazi-Parsa, 14 F.3d at 1428 (taking judicial notice of State Department Country Reports which "provide the vital context in which Petitioner's claim of political persecution must be evaluated.").
 
 
 33
 The 1988 Country Report relates that the Sandinistas used "coercive legislation, such as the law for the maintenance of order and public security, to neutralize independent groups, suppress opposition, and maintain its monopoly on power." Id. at 642 (emphasis added). The law "criminalizes a wide range of anti-government activities." Id. at 647. The Report also buttresses petitioners' claim that the Sandinistas are hostile toward COSEP:
 
 
 34
 [P]rivate organizations have been the focus of verbal attacks by Sandinista officials and by the Sandinista press; the Superior Council for Private Enterprise (COSEP) ... has been described, along with opposition political parties and the Catholic Church, as acting against the Nicaraguan revolution and for the United States.
 
 
 35
 Id. at 650. The 1989 Country Report describes the Law of Public Order as "draconian" and elaborates: "The [Nicaraguan] Government in past years used the Law for Maintenance of Public Order and Public Security, a vague instrument which criminalized a wide range of anti-government activities, to charge and sentence many Nicaraguans for political and 'counterrevoluntionary activities.' " Id. at 671. However, that Report also goes on to observe that the government repealed the law in October, 1989. Id. The significance of the law's repeal on Dr. Ubau-Marenco's case is a matter that needs further elaboration.
 
 
 36
 This court recently held that a summons could compel the conclusion that an asylum applicant had a well-founded fear of persecution: "a reasonable person in Petitioner's position would possess, upon receipt of the summons, a well-founded fear of persecution on account of political opinion." Shirazi-Parsa, 14 F.3d at 1429 (emphasis in original). The court reached this conclusion in light of Country Reports which established an "overall pattern of political arrests and detentions on the part of the Iranian regime...." Id. From the Country Study and the Country Reports before us, it appears that such a pattern existed in Nicaragua with regard to the Law of Public Order, lending reasonableness to petitioners' fear of persecution. In fact, petitioners present a somewhat stronger case than that reviewed in Shirazi-Parsa, because they have supplied the BIA with the summons and decree and those documents state the charges for which Dr. Ubau-Marenco is to be arrested. In Shirazi-Parsa, the court did not have a copy of the summons and the summons did not indicate charges. Id. at 1427-28. It appears that, as in Shirazi-Parsa, the summons and judicial decree contribute to petitioners' prima facie case for asylum eligibility to the extent that the repeal of the Law of Public Order does not render their fear of persecution objectively unreasonable.
 
 3.
 
 37
 We conclude that the BIA abused its discretion when it summarily rejected the summons and decree. The BIA neither adequately considered these documents nor sufficiently articulated its reasons for dismissing them. We have held that the BIA abuses its discretion when it denies a motion to reopen to consider new evidence without meaningfully evaluating the evidence presented and without sufficiently articulating the reasons for its denial. Mattis, 774 F.2d at 967-68; Sida v. INS, 665 F.2d 851, 854-55 (9th Cir.1981); see also 1 Charles Gordon & Stanley Mailman, Immigration Law and Procedure Sec. 3.05[a] at 3-75 (1995) ("[T]he Board must spell out the basis for its denial of a motion to reopen or reconsider."). These requirements apply equally to motions to remand. See Rodriguez, 841 F.2d at 867.
 
 
 38
 First, the BIA's cursory treatment of the newly submitted evidence is inadequate. The BIA addressed but quickly rejected the new evidence without meaningfully evaluating it. The BIA did not refer to the record, which contained information that illuminates the significance of the summons and decree. See Country Study at 223; AR at 285, 323. Such minimal consideration is inadequate: "In reviewing a BIA decision [on a motion to reopen] for abuse of discretion, we require that its stated reasons evidence its consideration of all relevant factors. Cursory, summary or conclusory statements are inadequate." Mattis, 774 F.2d at 967 (emphasis added) (citations omitted); see also Sida, 665 F.2d at 854 ("new evidence ... [is to] be meaningfully evaluated.").
 
 
 39
 Second, the BIA also concluded that the new evidence would not show how the outcome of the case would change but impermissibly "articulated no reasons for reaching this conclusion." Mattis, 774 F.2d at 968. As we have held, the BIA must:
 
 
 40
 [a]ddress the evidence presented, and state the reasons why, for example, the evidence is not sufficient under the applicable regulations; why a prima facie case has not been made out; or why, if a prima facie case is made out, a reopening is not warranted.
 
 
 41
 Sida, 665 F.2d at 854-55; see also, Tukhowinich v. INS, 64 F.3d 460, 464 (9th Cir.1995) (observing " '[A] board decision [is] ... set aside if it fails to support conclusions with "reasoned explanation based on legitimate concerns".' ") (citations omitted); Mejia-Carrillo v. INS, 656 F.2d 520, 522 (9th Cir.1981) (holding the BIA must "give reasons which show that it has properly considered the facts which bear on its decision" and remanding for reconsideration). Because the BIA has failed to articulate its reasons for denying petitioners the opportunity to have their new evidence considered, we cannot meaningfully review its decision. Accordingly, we must reverse and remand to the BIA with instructions for it to reconsider the motion to remand and to articulate the basis for any rulings it makes. Sida, 665 F.2d at 854; see also Castillo v. INS, 951 F.2d 1117, 1121 (9th Cir.1991) (holding "Board opinions that lack an adequate statement of the BIA's reasons for denying the petitioner relief must be remanded to the Board for clarification of the bases for its opinion."). In particular, if the BIA finds that petitioners failed to establish a prima facie case, it must state its reasons for so concluding. Sida, 665 F.2d at 854. If the BIA concludes that petitioners are not entitled to relief as a matter of discretion, it must state its reasons for so holding. See, e.g., Mattis, 774 F.2d at 968 (holding "BIA discretionary denials must show that the BIA weighed both favorable and unfavorable factors."). We note that "[i]n determining whether to grant asylum as a discretionary matter, the likelihood of future persecution is a particularly important factor to consider." Kazlauskas, 46 F.3d at 906 (citation omitted). As discussed above, the new evidence submitted by petitioners is highly relevant to considering the likelihood that the petitioners would be persecuted should they return to Nicaragua.
 
 III.
 
 42
 We affirm the BIA's conclusion that petitioners are not refugees on the basis of past persecution. We hold, however, that the BIA abused its discretion by failing to consider adequately the summons and decree and by failing to articulate sufficiently its reasons for denying petitioners' motion to remand. Accordingly, we remand for the BIA to reconsider the petitioners' motion to remand. On remand, the BIA is to meaningfully consider the summons and decree in light of the evidence in the record and the Country Reports, of which we take judicial notice. The BIA must articulate the reasons for any rulings it makes.
 
 
 43
 PETITION FOR REVIEW GRANTED. The BIA's Order is AFFIRMED IN PART and REVERSED IN PART. The case is REMANDED to the BIA for reconsideration.
 
 
 
 [1]
 The name of the organization in Spanish is Cosejo Superior de Empresa Privada
 
 
 [2]
 Petitioners also claim that the two petitioner children were harassed by the Sandinistas. Dr. Ubau-Marenco testified that the children's school was attacked by members of the Sandinista Youth movement because the school was private and reputed to be bourgeois. Dr. Ubau-Marenco also reported that one of the children was followed by Sandinista Youth members on his way to the pharmacy. As the BIA found, the petitioners have not shown that these incidents amount to persecution for political opinion
 
 
 [3]
 In dictum, the BIA went on to hold that even if petitioners were eligible for asylum as refugees on the basis of past persecution, it would not exercise its discretion to grant favorable asylum relief to the petitioners because Dr. Ubau-Marenco's case lacks the "humanitarian or compelling bases" that would warrant favorable asylum relief. In re Ubau-Marenco, Nos. Anj-gcu-zhf, Auv-soe-ptt, Ajp-vkw-fcm, Aez-hef-ruc, slip op. at 5 (BIA May 30, 1993) ("BIA Opinion" ); AR at 6. Where there has been past persecution but there is little likelihood of future persecution, a favorable exercise of discretion may be warranted for "humanitarian reasons" where an applicant or his family has suffered " 'atrocious forms of persecution.' " Matter of Chen, Interim Decision 3104 (BIA 1989) (citation omitted); Kazlauskas, 46 F.3d at 905 (following Chen ). Petitioners argue that Chen should be overruled and that, in the alternative, humanitarian or other compelling factors exist in their case. Because the BIA's holding on this issue is dictum, and we affirm the BIA's finding of no past persecution, we need not address this argument
 
 
 [4]
 The BIA recognized that members of petitioners' family "may have been detained, harassed, and mistreated by the Sandinistas." BIA Opinion at 4; AR at 5. Attacks on one's family members may, under certain circumstances, contribute to a well-founded fear of persecution. See, e.g., Prasad, 47 F.3d at 340. Two of Dr. Ubau-Marenco's brothers have been arrested in Nicaragua. One was arrested and detained for eight months on charges of trafficking in the black market, but was found not guilty and was released. The other was arrested and detained for a short time in 1986 on charges of being a "counterrevolutionary."
 As the Respondent points out, there is no indication that the brother arrested on the trafficking charge was arrested for anything other than the legitimate prosecution of suspected criminal activity, which does not constitute persecution. Abedini, 971 F.2d at 191. More importantly, there is no evidence that either arrest bore any relationship to the petitioners' political opinion. See Prasad, 47 F.3d at 340 (holding "attacks on family members do not necessarily establish a well-founded fear of persecution absent a pattern of persecution tied to petitioners."). In addition, that many of petitioners' close family members remain in Nicaragua without incident weakens the argument that petitioners possess a well-founded fear of persecution for their political opinion on the basis of persecution of other family members. See Prasad, 47 F.3d at 339.
 
 
 [5]
 At oral argument, counsel for the INS inaccurately stated that only the summons was presented to the BIA. In its opinion, the BIA specifically stated "the respondents have come forward with, what appears to be, a citation and court order...." BIA Opinion at 5; AR at 6 (emphasis added). Moreover, both documents are in the Administrative Record. See AR at 47 & 49
 
 
 [6]
 Petitioners submitted a new English translation of the decree to this court, quoted above, which they assert is a more literal translation. The second translation states that Dr. Ubau-Marenco has violated the "Law of Maintenance and Public Security in relation to the political" which brands him as a "rebel." The translation petitioners submitted to the BIA omits the phrase "in relation to the political." This omission is not significant, since the political nature of the charge should have been clear to the BIA from reading the summons and from the Spanish version of the decree, which uses the word "politico"--the decree states Dr. Ubau-Marenco is being cited for violating the law "en relacion a lo politico...." AR at 47. We take judicial notice of this second translation
 We refer to the law hereinafter as the "Law of Public Order."
 
 
 [7]
 8 C.F.R. Sec. 3.2 provides, in pertinent part:
 Reopening or Reconsideration.
 The Board may on its own motion reopen or reconsider any case in which it has rendered a decision. Reopening or reconsideration of any case in which a decision has been made by the Board ... shall be only upon written motion to the Board. Motions to reopen in deportation proceedings shall not be granted unless it appears to the Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing; nor shall any motion to reopen for the purpose of affording the alien an opportunity to apply for any form of discretionary relief be granted if it appears that the alien's right to apply for such relief was fully explained to him and an opportunity to apply therefor was afforded him at the former hearing unless the relief is sought on the basis of circumstances which have arisen subsequent to the hearing.
 
 
 [8]
 8 C.F.R. Sec. 3.8 provides, in relevant part:
 Motion to reopen or motion to reconsider.
 (a) Form. Motions to reopen and motions to reconsider shall be submitted in triplicate ... Motions to reopen shall state the new facts to be proved at the reopened hearing and shall be supported by affidavits or other evidentiary material.
 
 
 [9]
 Motions to remand and motions to reopen are governed by the same standards. Rodriguez, 841 F.2d at 867
 We recognize that the petitioners' submission of the new evidence may not have fully complied with technical procedural requirements of the regulations governing motions to reopen or remand. See 8 C.F.R. Secs. 3.2, 3.8. However, the BIA did not indicate any objection to the manner in which the new evidence was submitted. The BIA did not request that petitioners file a motion with the new evidence. Instead, the BIA briefly considered the new evidence and dismissed it on its merits, concluding that the new evidence would not change the result in the case. It is possible that the BIA considered the evidence on its own motion. 8 C.F.R. Sec. 3.2 ("The Board may on its own motion reopen or reconsider any case in which it has rendered a decision."). If the BIA deemed the submission of new evidence to be a motion and denied that motion, it dispensed with formalities. It would therefore be illogical for the BIA to have denied the motion for failure to meet formal requirements. Thus, we proceed under the assumption that the failure to comply with procedural requirements is not the reason for the BIA's failure to consider the new evidence.